1              IN THE UNITED STATES DISTRICT COURT

2                       DISTRICT OF UTAH

3                       CENTRAL DIVISION

4

5  UNITED STATES OF AMERICA,     )

6            Plaintiff,          )

7     vs.                        )  Case No.  2:12-MJ-301-PMW

8  ANATOLIY N. BARANOVICH,       )          2:12-CR-686-RJS

9            Defendant.          )

10 _____)

11

12          BEFORE MAGISTRATE JUDGE DUSTIN B. PEAD

13          ---------------------------------------

14                    October 19, 2012

15                    Detention Hearing

16 Transcript Prepared From An Electronically Recorded Hearing

17

18

19

20

21

22

23

24 REPORTED BY: Patti Walker, CSR, RPR, CP

25 350 South Main Street, #146, Salt Lake City, Utah  84101

A P P E A R A N C E S

For Plaintiff:                    Michael Kennedy, AUSA
                                  David Barlow, USA
                                  185 South State Street, #300
                                  Salt Lake City, Utah  84111


For Defendant:                    Robert Hunt
                                  UTAH FEDERAL DEFENDER OFFICE
                                  46 West Broadway, #110
                                  Salt Lake City, Utah  84101

3

1                         I N D E X

2    Witness                Examination By              PAGE

3    Cameron Smilie         Mr. Kennedy  (Direct)          6

4                           Mr. Hunt  (Cross)             24

5                           Mr. Kennedy  (Redirect)       33

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1      SALT LAKE CITY, UTAH; FRIDAY, OCTOBER 19, 2012; 2:30 P.M.

 2                            PROCEEDINGS

 3              THE COURT:  Good afternoon everybody.  My name is

 4      Dustin Pead, Magistrate Judge, District of Utah.  Today's

 5      date is October 19th, 2012.  We're hear in the matter of the

 6      United States of America vs. Anatoliy N. Baranovich,

 7      2:12-MJ-301, assigned to Magistrate Judge Warner.  The

 8      government is represented by Mr. Michael Kennedy, with the

 9      United States Attorney Mr. Barlow.  The defense is

10      represented by Mr. Hunt.

11              We do have a contract interpreter who is assisting

12      us today.

13              Ma'am, I'm sorry.  I forgot to get your name.

14      Would you please give us your name for the record.

15              THE INTERPRETER:  Dina Hall.

16              THE COURT:  Thank you very much for being here.  I

17      appreciate it.

18              Gentlemen, we're here on a detention hearing.

19      I've had a chance to review very briefly a Pretrial Service

20      report.

21              Mr. Hunt, have you seen that report as well?

22              MR. HUNT:  I have, Your Honor.

23              THE COURT:  Mr. Kennedy?

24              MR. KENNEDY:  Yes, Judge.

25              THE COURT:  I've also been provided some
```

1  additional information based on your efforts over the past

2  couple of hours.  So it's supplemented to a degree.

3          Mr. Kennedy, you indicated before we went on the

4  record and informed me that you had let Mr. Hunt know you

5  may present some witnesses.  How would you like to proceed

6  today?

7          MR. KENNEDY:  Your Honor, I do have one witness

8  that we would like to present that has information that we

9  think is not reflected in the pretrial services report but

10  we think is highly relevant to Your Honor's decision with

11  regard to whether the defendant constitutes a risk of

12  nonappearance or a danger to the community.

13          THE COURT:  Would you prefer to present the

14  witnesses and then make your argument at the end, then?

15          MR. KENNEDY:  If that's convenient to the Court.

16          THE COURT:  That's fine.

17          Mr. Hunt, you were aware of this witness?

18          MR. HUNT:  I was aware of the witness, Your Honor.

19          THE COURT:  Okay.  Great.

20          Mr. Kennedy, who is it?

21          MR. KENNEDY:  The United States calls Cameron

22  Smilie.

23          THE COURT:  Mr. Smilie, would you please come on

24  up.  There's a witness stand right here to my right.  If you

25  could stand next to that chair and raise your right hand.

```
 1                          CAMERON SMILIE,
 2                 Having been duly sworn, was examined
 3                     and testified as follows:
 4            THE COURT:  Thank you very much.  Would you please
 5  be seated.
 6            Mr. Kennedy, the witness is yours.
 7            MR. KENNEDY:  Thank you.
 8                      DIRECT EXAMINATION
 9  BY MR. KENNEDY:
10  Q    Would you please again state your name and spell it for
11  the record.
12  A    My name is Cameron Smilie, special agent.
13  C-a-m-e-r-o-n, S-m-i-l-i-e.
14  Q    Where are you employed?
15  A    FBI.
16  Q    What is your position?
17  A    I'm a special agent.
18  Q    How long have you had that position?
19  A    Approximately two years.
20  Q    What are your general duties?  What's your current
21  assignment?
22  A    Primarily I'm assigned to the domestic terrorism squad
23  of the joint terrorism task force.  My collateral duty is
24  airport liaison agent for Idaho, Montana and Utah.
25  Q    And you've been to the FBI Academy?
```

1  A    Yes.

2  Q    As part of your duties do you respond to criminal

3  offenses or alleged criminal offenses that occur at the

4  airport or in the special aircraft jurisdiction of the U.S.?

5  A    Yes.

6  Q    I want to direct your attention back to October 15th to

7  16th.  Were you asked to respond to an incident on that

8  date?

9  A    Yes.

10  Q    About what time?

11  A    Approximately 11:30 p.m.

12  Q    Where did you go?

13  A    I responded directly to the Salt Lake International

14  Airport police department.

15  Q    What was the general nature of the complaint?

16  A    My dispatch informed me that a passenger had opened the

17  door on an aircraft while in flight.  I also spoke with the

18  airport police department that informed me that the door had

19  been opened shortly after touching down.

20  Q    You, in fact, investigated part of this offense

21  yourself?

22  A    Correct.

23  Q    You're also relying on reports from other officers and

24  individuals?

25  A    Yes.

1   Q    Now was there an altercation involving -- first of all,

2   do you recognize the subject of that case?

3   A    I do.

4   Q    Do you see him in the courtroom?

5   A    Yes.

6   Q    Would you just identify him for us?

7   A    He's right there.

8        MR. HUNT:  We would stipulate to identification.

9   BY MR. KENNEDY:

10  Q    Was there an altercation on board the aircraft --

11  physical altercation?

12  A    Yes.

13  Q    Was it is necessary to subdue the defendant?

14  A    It was.

15       MR. HUNT:  Your Honor, may I request -- I know

16  you're relying on others' information, but could I request

17  that he identify the source of the information?

18       THE COURT:  Could you lay a little bit more

19  foundation, Mr. Kennedy, please.

20  BY MR. KENNEDY:

21  Q    Who did you -- did you conduct any interviews with

22  regard to what happened on the airplane?

23  A    I conducted four personal interviews and collected

24  approximately ten witness statements and spoke to airport

25  police.

1  Q    Did you interview people that were directly involved in

2  this physical altercation?

3  A    I interviewed the people directly involved and people

4  around the incident.

5  Q    How many -- was it necessary to subdue -- physically

6  subdue the defendant on board the aircraft?

7  A    Yes.

8         MR. HUNT:  Again, could we have -- when we get

9  into specific facts, could we identify the name of the

10 specific person with whom they interviewed as to those

11 facts, some foundation laid?

12        THE COURT:  Could you follow up that question with

13 asking him to identify who explained that that took place,

14 then, Mr. Kennedy.

15 BY MR. KENNEDY:

16 Q    Who did you specifically interview with regard to

17 subduing the defendant on the aircraft?

18 A    The flight attendant, Marilyn Isler, and the individual

19 who ended up subduing the subject, Patrick Tominey.

20 Q    I'm sorry?

21 A    Tominey.

22 Q    Tominey?

23 A    Tominey.  T-o-m-i-n-e-y.

24        THE COURT:  He was a passenger?

25        THE WITNESS:  He was a passenger, yes.

1    BY MR. KENNEDY:

2    Q    Were you told how many people were required to subdue

3    the defendant on the aircraft?

4    A    Originally five passengers attempted to subdue the

5    subject.  Patrick Tominey was the sixth.

6    Q    Did he ultimately succeed in subduing him?

7    A    He did.

8    Q    Are you aware of any altercations -- physical

9    altercations involving the defendant after his arrest?

10   A    I'm aware of two.

11   Q    Were you personally present for any of these?

12   A    Yes.

13   Q    Please describe that one for us.

14   A    Prior to interviewing Mr. Baranovich, he was seen in

15   his holding cell breathing very heavily, seemed to be

16   laboring.  Paramedics were called from airport police

17   department, responding from the fire station near the

18   airport.  When they responded, he became extremely agitated

19   and began to speak with myself and supervisory Special Agent

20   Viti.  At that time we decided to interview him.

21        After the interview, while we were searching --

22   Q    Before we get to that point, first of all, was he given

23   his Miranda rights?

24   A    He was.

25   Q    Did he waive those?

1   A    He waived those.

2   Q    Were you assisted in talking with him, you and Special

3   Agent Viti assisted in speaking with him by somebody that

4   speaks Ukrainian or Russian?

5   A    Correct.

6   Q    So the responses that you got from him came to you via

7   a translator?

8   A    That is correct.

9   Q    That translator, is he or she certified by the FBI to

10  translate?

11  A    He is.

12  Q    When you interviewed him, we might get to the substance

13  of what he said in a little bit, but did he appear to you to

14  be coherent?

15  A    Yes.

16  Q    What was his demeanor?

17  A    He was fairly calm, fairly relaxed, somewhat worried

18  about what he was -- who -- what he was doing and why he was

19  detained, but he was relaxed and calm.

20  Q    And without getting into too many of the details at

21  this point, did there come a point where that demeanor

22  changed?

23  A    Yes.

24  Q    When his demeanor changed, how did it change?

25  A    He became extremely agitated, became violent, started

1  striking the holding cell window with his hands, feet, arms.

2  I couldn't see exactly what he was hitting it with, but I

3  could hear him screaming and I could hear the bangs against

4  the glass.

5  Q     What was done in response to that?

6  A     Airport police opened the cell door.  Since we had

7  removed his handcuffs and placed his hands in front of him

8  to interview him, to allow him to feel more comfortable,

9  airport police opened the cell door in order to replace his

10  hands behind his back and restrain him to the bench that he

11  was sitting on.  Two airport police officers entered the

12  cell, another entered the cell behind them, and I entered

13  just the threshold of the cell and began to tussle with him.

14  Q     And did he continue to fight all of the officers,

15  including yourself?

16  A     He did, though I wasn't directly engaged with him

17  because of the size of the cell.  There were three large

18  officers and him in this very tiny cell.  Although he wasn't

19  able to actually strike the officers because of how small it

20  was, he was attempting to rip the officers' hands away,

21  somewhat escape from the officers in the cell, struggle any

22  way he could from what the officers wanted him to do.

23       He was given commands by the linguist from the

24  officers, and he refused.

25  Q     Was he ultimately subdued?

1    A    He was ultimately subdued.  His hands were cuffed

2    behind his back and he was restrained to the bench.

3    Q    At that point did he answer any further questions?

4    A    No.

5    Q    Was he taken to jail?

6    A    He was.

7    Q    What jail was he taken to?

8    A    Davis County jail.

9    Q    Have you been made aware of any altercations involving

10   him at the jail?

11   A    Yes.

12   Q    How were you made aware of those?

13   A    Approximately an hour and a half after I booked him at

14   Davis County jail, I was called by the duty sergeant who

15   informed me that he had become extremely violent and

16   agitated and actually asked to -- and challenged the

17   officers to fights, to enter his cell.

18   Q    What's the name of the officer that gave you this

19   information?

20   A    I don't recall the sergeant's name.

21   Q    Did you subsequently get a report of exactly what

22   happened?

23   A    I'm in the process now.

24   Q    Let me rephrase that.  Were you subsequently told by

25   officers involved what happened?

1    A    Yes.

2    Q    Who told you that?

3    A    The on-duty sergeant, the captain, and the lieutenant

4    at the jail.

5    Q    And what did they tell you happened?

6    A    They described to me that he, after being placed in a

7    holding cell by himself -- because of the violence he

8    displayed at the airport, he was placed in a cell by

9    himself, at which time he decided to remove all of his

10   clothes and started to attempt to break the glass on the

11   cell door with his elbows.  He succeeded in breaking some

12   glass, causing cuts on his elbows and bleeding all

13   throughout the cell.

14   Q    How did officers respond to that?

15   A    They attempted to enter the cell, and he moved to the

16   back of the cell and challenged them and took a fighting

17   stance.

18   Q    Then what happened?

19   A    The officers backed out and requested a cell extraction

20   team, which did respond.  The cell extraction team entered

21   the cell and attempted to restrain him.  They were required

22   to use a taser to restrain him further, which they used six

23   times.  I was told that the subject continued to fight

24   through the taser, at which time the cert team -- the cell

25   extraction team backed out of the cell again.  And they

1    contacted myself to ascertain whether or not he was going to

2    appear if he was scheduled for initial appearance that day

3    because they were considering using Haldol or a chemical

4    restraint.

5    Q    Was that ultimately used?

6    A    They did use Haldol.  He was restrained some.

7    Q    Did you have a subsequent encounter with him where he

8    displayed aggressive --

9    A    Yes.

10   Q    What happened?

11   A    I was asked by the U.S. Attorney's Office to go up to

12   Davis County jail and assess whether or not the Haldol may

13   have affected him to the point where he couldn't appear for

14   an initial appearance.  So I went up there.  They opened --

15   we opened the cell door, he spoke with a linguist that he

16   was familiar with and myself, and he agreed to come and show

17   for his initial appearance and that he was coherent and he

18   understood what I was saying and knew what we were going to

19   do.

20   Q    This was on October 16th, correct?

21   A    Correct.

22   Q    Then what happened?

23   A    As he agreed to come to the initial appearance, we told

24   him that we would have to shackle him and restrain his hands

25   and put some clothes on him.  He refused to put clothes on

1    or refused to have any shackles.  He informed me that he

2    would not go -- he would not go if he had to go like that,

3    referring to the handcuffs.  At that time we decided, since

4    it took an entire cell extraction team to restrain him once,

5    it was too dangerous to try and transport him here by

6    ourselves.

7    Q    Now were you subsequently able to transport him the

8    next day?

9    A    Yes.

10   Q    And were there any problems that day?

11   A    No.

12   Q    Let me get back to ask a couple of questions about the

13   interview that you conducted with Mr. Baranovich.  Did you

14   ask him any questions with regard to his residency,

15   nationality, immigration status?

16   A    Yes.

17   Q    What did he tell you?

18   A    He informed me that he was a permanent resident and he

19   had entered the United States in 1997 as a refugee.

20   Q    From what country?

21   A    Ukraine.

22   Q    Did you ask him the circumstances -- about the

23   circumstances of his refugee status?

24   A    Yes.

25   Q    What did he tell you?

1    A    He informed us that he was religiously persecuted for

2    his religious beliefs as a Pentecostal Baptist.

3    Q    Did you ask any follow-up questions?

4    A    I asked him directly after that response whether or not

5    that was a lie or fraudulent, and he informed me that it

6    was.

7    Q    When he was arrested at the Salt Lake International

8    Airport, where was he traveling from?

9    A    He was traveling from Kiev, Ukraine to Portland,

10   Oregon.

11   Q    He had intermediate stops along the way?

12   A    Yes.

13   Q    Where were those stops?

14   A    He connected -- he flew from Kiev to Amsterdam,

15   Amsterdam to Boston, and Boston to Salt Lake.

16   Q    Did you ask him any questions about what he was doing

17   in the Ukraine?

18   A    I did.

19   Q    What did he tell you?

20   A    He told me that he was on a 50-day vacation --

21   approximately 50-day vacation visiting his sister in the

22   Ukraine, in Boiko.

23   Q    Did he tell you any additional purpose with regard to

24   that vacation?

25   A    Yes.  He also told me that he had gone to the Ukraine

1   planning to pay and lay a foundation on a house that he was

2   building in the Ukraine.

3   Q    Did he have any cash on him when he was arrested?

4   A    Yes.

5   Q    Where was that cash located?

6   A    In a fanny pack on his person.

7   Q    What -- how much cash?

8          THE INTERPRETER:  Your Honor, just one second.

9   The interpreter needs clarification.  A fanny pack?

10         THE WITNESS:  It's a bag on his waist.

11         THE COURT:  Thank you.

12  BY MR. KENNEDY:

13  Q    Was there U.S. currency in there?

14  A    $6,534.01 in U.S. currency.

15  Q    Did you find any ATM receipts or bank receipts?

16  A    I found one ATM receipt reflecting a deposit -- or a

17  removal of $5,000 from a savings account -- I believe it was

18  a savings account.

19  Q    When approximately was that dated?

20  A    August -- late August.

21  Q    And did he have any other significant currency on him?

22  A    He had some Ukrainian kopecks and a Panamanian quarter.

23         MR. HUNT:  A Panamanian what's that?

24         THE COURT:  Quarter?

25         THE WITNESS:  Quarter.  I'm not exactly sure of

1  the currency.

2  BY MR. KENNEDY:

3  Q    A coin?

4  A    Coin.

5  Q    Was any mention -- first of all, did you ask him the

6  purpose of that money?

7  A    I did.

8  Q    What did he say?

9  A    He said that he was going to use it to pay for his --

10 for the vacation and also to lay a foundation on his house.

11 Q    Did he say anything else with respect to that money?

12 A    No.

13 Q    Did he make any offers with regard to that money?

14 A    Yes.

15 Q    What -- tell us about that.

16 A    While he was being seen by the paramedics at the

17 airport police department directly outside of his cell, he

18 offered to pay the airport police department to let him go.

19 Q    And --

20       MR. HUNT:  Could I get some foundation on that

21 further, please?

22       THE COURT:  Sure.

23 BY MR. KENNEDY:

24 Q    Were you present for that?

25 A    Yes.

1    Q    You heard that yourself?

2    A    Yes.

3    Q    And you heard that through the translator?

4    A    Yes.

5    Q    And did he make any further similar offers?

6    A    He again offered, but he offered to myself and

7    supervisory Special Agent Viti, he offered to pay us the

8    money we had found in his bag, his fanny pack, offered to

9    pay us to let him go.

10   Q    How did you respond to that?

11   A    We told him that we didn't work like that.  We weren't

12   going to take that offer.

13   Q    Where is the cash right now?

14   A    It's held in my evidence room at the Salt Lake City

15   FBI.

16   Q    Was a search conducted of his checked baggage or his

17   carry-on baggage?

18   A    Yes.

19   Q    Either or both?

20   A    Both.

21   Q    And was that pursuant to consent?

22   A    Yes, it was.

23   Q    Would you please tell the Court, just in a general

24   form, what was found in his luggage.

25   A    In his luggage I found four packages, approximately

softball size, wrapped in paper bag, plastic bag and clear
tape some type of pharmaceutical, some type of blister
packaged pill with Russian or Ukrainian writing on it.   In
the other packages -- in these four packages were also
bottles of rust colored liquid and other pills that were
unidentifiable.

Q     Is the process ongoing to try to identify those items?

A     Yes.

Q     What else was found?

A     I found some pictures, some family pictures.  I found
several boxes of chocolate, several bags of cologne and
perfume, a pair of women's underwear, a wig or hair
extension.  I found 19 Ukrainian passports, none of which
were Mr. Baranovich.  I found his cell phone.

Q     Let me ask you, did you ask any questions to him about
his criminal history, whether he had a criminal history?

A     Yes.

Q     What did he tell you?

A     He told me that he had no criminal history in the
United States.  I asked him if he had a criminal history or
had been to prison in the Ukraine.  He told me that he was
arrested once in the Ukraine for fighting at a discotheque.
He told me that he was arrested once again in the Ukraine
for theft of a motorcycle, for which he received two years
in prison.

1  Q    You mentioned earlier that at some point he, during the

2  interview, he became extremely agitated and violent.  At

3  what point was that?

4  A    Not during the interview.

5  Q    Not during the interview.  During the process at the

6  jail?

7  A    Yes.

8  Q    At the airport?

9  A    Correct.

10       MR. HUNT:  Are we talking about the first

11  interview where you were present or was there a second

12  interview?

13       THE WITNESS:  There was only one interview.

14  BY MR. KENNEDY:

15  Q    Again, to be clear, what we're talking about right now,

16  you were actually present and observed this?

17  A    Yes.

18  Q    Let me just ask it directly.  You said you found a

19  number of Ukrainian passports?

20  A    Yes.

21  Q    Did you pull those out of his luggage?

22  A    Yes.

23  Q    Did you show them to him?

24  A    I didn't outwardly show them to him, but where his cell

25  was situated, he could see me searching his bags.

1    Q    What was his reaction?

2    A    He became extremely violent.  He started to pray.  What

3    he was saying was being translated.  I was being told that

4    he was praying.  He started to bang on the glass and thrash

5    around.  This is the incident that I described earlier.

6              MR. KENNEDY:  May I have just one second, Judge?

7              THE COURT:  Yes.

8              MR. KENNEDY:  Just a couple other questions.

9    BY MR. KENNEDY:

10   Q    The passports that were found, would you please

11   describe them for the Court.

12   A    As I said, they were all Ukrainian passports.  There

13   were three males.  The overwhelming majority of the

14   passports were generally younger females.

15   Q    What is the general age range on the passports?

16   A    Between 20 and early thirties.

17   Q    And did they show any indication in them of travel?

18   A    Some of them had very little travel, but many of them

19   had extensive travel.  Some of them actually ran out of room

20   for stamps -- visa stamps.

21             MR. KENNEDY:  No further questions, Judge.

22             THE COURT:  Mr. Hunt.

23             MR. HUNT:  One second, Your Honor.

24   //

25   //

1                           CROSS-EXAMINATION

2    BY MR. HUNT:

3    Q    Mr. Smilie -- Agent Smilie, in the beginning of your

4    testimony you were told, if I understand, that the plane was

5    in flight, but you learned from somebody that the plane was

6    actually touched down when this incident occurred?

7    A    Yes.

8    Q    And would that have been through the flight staff again

9    that you referenced who you interviewed?

10   A    No.

11   Q    Who told you that the plane had actually touched down

12   at that point?

13   A    Airport police.

14   Q    Do you recall the names of the airport police that you

15   interviewed?

16   A    Sergeant Grundell, I believe it's G-r-u-n-d-e-l-l, and

17   Officer Tyson Jones.

18   Q    Now during any of your interviews that you participated

19   in at the jail, were you aware of others or yourself that

20   taped interviews with Mr. Baranovich?

21   A    Interviews were not taped.

22         MR. KENNEDY:  Your Honor, I want to object to this

23   on relevance of whether they were taped.

24         THE COURT:  Mr. Hunt, your argument on relevance.

25         MR. HUNT:  I will move on.

1   BY MR. HUNT:

2   Q    You said there were ten statements that you took?

3   A    Approximately ten statements.

4   Q    Approximately.  And this is where I was a little bit

5   confused.  I will jump to this one instead.  You were aware,

6   you stated, two altercations had occurred after the incident

7   on the airplane?

8   A    Yes.

9   Q    From what I gather the first one would have been the

10   one in your presence at the airport?

11   A    Uh-huh. (Affirmative)

12   Q    After you were called there.  And from what I gather,

13   you were -- it was apparent that prior to you arriving after

14   the initial subduing, which was quite significant, on the

15   airplane, that he remained calm until you got there and even

16   until you were there for some point in time, correct?

17   A    Yes.

18   Q    And what other agents were present at the time that

19   this second incident occurred where you -- not second, the

20   first incident you observed where he became anxious again?

21   A    Supervisory Special Agent Linda Viti.

22   Q    Just the two of you?

23   A    That's it.

24   Q    And at the time that you conducted your interview he

25   was coherent?

1    A    Yes.

2    Q    He had a calm demeanor?

3    A    Fairly calm.  We were providing him a glass of water.

4    He said he felt sick and thirsty, so we gave him a glass of

5    water and he relaxed.

6    Q    Did he discuss the fact that he had drunk significant

7    amounts of alcohol on the plane?

8    A    Yes -- on the flight?

9    Q    Yes.

10   A    No.

11   Q    How did he refer to his drinking or consuming of

12   alcohol to you?

13   A    Well, there was a long discussion about how much

14   alcohol he had drank over the last 50 some days in the

15   Ukraine.  We asked specifically how much alcohol he had

16   drank in transit from Kiev to Salt Lake City.  He didn't

17   remember specific amounts, but it was each stop he may

18   have -- I think he may have had -- he thinks he could have

19   had a couple of beers.  He said he may have had one glass of

20   water and one glass of wine on the flight to Salt Lake City.

21   Q    Did anyone conduct any testing -- alcohol testing?

22   A    I was told that Davis County jail conducted a PBD,

23   which I'm not exactly sure the technical term for that, but

24   they said he had no alcohol in his system.

25   Q    Do you know how long after the incident that was?

1    A    Probably about seven or eight hours.

2    Q    And you stated that there was a second incident that

3    you were aware of that occurred at the jail when they

4    attempted to cuff him to bring him to court?

5    A    Yes, sir.

6    Q    And --

7    A    Actually that wasn't when they attempted to take him to

8    court.  It just happened.

9    Q    It just happened?

10   A    Yes.

11   Q    Do you know how long after his arrival that that

12   occurred or was it upon arrival?

13   A    Maybe about an hour.

14   Q    So this was closely after being placed in the Davis

15   County jail?

16   A    Yes.

17   Q    When it came time to bring him to court, are you aware

18   of what his demeanor was at that time?

19   A    Yes.

20   Q    What was that?

21   A    He was obviously a little agitated from his encounter

22   with Davis County jail.  He recognized myself and the

23   linguist that had dealt with him earlier.  Prior to that, I

24   was told he wouldn't allow anybody to even open the door

25   without a fight, and he opened the door and spoke with us.

1    Q    Did he show you respect at that time?

2    A    Yes.

3    Q    And you say he did recognize you?

4    A    Yes, I think so.

5    Q    And so you were able to bring him to court for his

6    initial appearance?

7    A    No.

8    Q    At that time you were not able to bring him?

9    A    No.  He refused to place handcuffs or any type of

10   restraints, or his clothing.

11   Q    Were you there when they brought him to court?

12   A    I went the next day and brought him to court.

13   Q    Describe what happened at that time.

14   A    He was very cooperative, very quiet.  The only thing I

15   can remember that stood out in my mind from the entire

16   transit is he soiled himself, and that was it.

17   Q    Did he recognize you at that time -- and this would

18   have been on the 16th, if I'm not mistaken?

19   A    That would have been the 17th.

20   Q    The 17th?

21   A    Yes.

22   Q    Did he recognize you at that time?

23   A    I don't know.  I didn't have a linguist present.

24   Q    Okay.  But he did not fight you?

25   A    No.  He was already placed in the van when I got there.

1    Q    Have you been made aware of any other incidents that

2    occurred at the jail since he was brought and was appointed

3    counsel?

4    A    No.

5    Q    Would it surprise you -- would you have heard of any

6    other incidents that occurred?

7    A    I'm sure I would have, yes.

8    Q    Now the ATM receipt that you discussed was a removal of

9    money?

10   A    I believe so, either from a savings account to a

11   checking account or cash.  I can't --

12   Q    And you stated at this time when you got -- now to the

13   first time, he offered you money?

14   A    The first time he offered the airport police officers

15   that were standing next to him, and the paramedic.

16   Q    Are you aware of how police arrests work in Ukraine at

17   all?

18   A    No.  I've never been there.  I'm sure it's --

19   Q    When you got permission to search his bag, did you

20   receive written consent?

21   A    Verbal and written.

22   Q    Verbal and written.  Was any of that taped or was it

23   just --

24   A    No, it's written.

25   Q    These medications, did you field test any of these

1    medications you saw for any drugs?

2    A    I'm not trained to field test anything.

3    Q    Would you have recognized if any -- have you been

4    trained to identify any type of illicit drug in your

5    training?

6    A    I have.

7    Q    Did any of these drugs appear to you immediately to be

8    some type of illicit, i.e., cocaine, meth?

9    A    No.

10   Q    Marijuana?

11   A    No.

12   Q    You said some of these were in blister packages?

13   A    Yes.

14   Q    Which would seem to be professionally prepared with

15   some type of medication?  Yes?

16   A    Yes.  I'm not aware of how they were prepared in the

17   Ukraine.

18   Q    Have you had any follow-up with the Ukrainian

19   consulate?  Have you discussed this with anyone there?

20   A    I notified the Ukrainian consulate via facsimile in

21   Washington, D.C.

22   Q    And are you aware of any contacts that have occurred

23   between the Ukrainian consulate and Mr. Baranovich?

24   A    Mr. Baranovich, no.

25   Q    Have agents visited the Baranovichs' home, are you

1    aware?

2    A    Yes.

3    Q    Did you receive any information from those individuals

4    when you visited the home?

5    A    Yes.

6    Q    Could you describe what they told you?

7    A    The interview they conducted, I believe the agent asked

8    if his father had been drinking, binge drinking.  He said he

9    probably had been, he had been on vacation.  He asked him if

10   he had any mental issues.  His son said -- I was told his

11   son said that he wasn't aware of any mental issues.  He

12   asked his son if -- the agent asked his son if there was

13   anything that his father may be involved with, have done, or

14   think that he may be in trouble for causing him to act the

15   way he was acting, referring to the violence that he

16   displayed.  His son said -- didn't answer the question.  He

17   said no.  That's it.  That's all I know of the interview.

18   Q    Implicit in this discussion was that it was certainly

19   identified that this was Mr. Baranovich's home, he lived

20   there?

21   A    Yes, that's what --

22   Q    This was his wife you were speaking to?

23   A    No, his son.

24   Q    His son?

25   A    Correct.

1   Q     But that he had a wife who lived there with him also?

2   A     Yes.

3   Q     And was there any discussion about whether he was

4   employed?

5   A     Between?

6   Q     These agents that were there.

7   A     I don't know.

8   Q     Have you spoken to the son?

9   A     Yes.

10  Q     And was that a different discussion than what you just

11  described or did you have a -- what was your discussion with

12  his son?  What was his name first?

13  A     His name I believe is Roman.  Mr. Baranovich asked us

14  to call his wife, so we did, from the interview room.  The

15  linguist spoke with his wife for a very short time, and his

16  son took over the phone and requested to speak to an English

17  speaking agent.  I took the phone and informed Roman of what

18  had occurred on the aircraft, or I had been told had

19  occurred on the aircraft.  I informed him that I would be

20  arresting him for those violations.  And at that time I told

21  him I would be taking him to Salt Lake County Adult

22  Detention Center.  I ended up taking him to Davis County

23  obviously.

24        I asked him had his father been on vacation.  The same

25  answers were provided as to the agents in Portland, and

1    asked him if he had any mental issues, which he said he

2    doesn't know but he doesn't think so.

3              MR. HUNT:  No further questions at this time.

4    Thank you.

5              THE COURT:  Mr. Kennedy.

6              MR. KENNEDY:  Just a couple of quick follow-up

7    questions.

8                        REDIRECT EXAMINATION

9    BY MR. KENNEDY:

10   Q    Did you conduct any interviews with the flight crew as

11   to Mr. Baranovich's demeanor prior to the incident on board

12   the aircraft?

13   A    Yes.

14   Q    Who did you interview?

15   A    Marilyn Isler, the flight attendant in his section.

16   Q    Did she describe his demeanor to you during the flight?

17   A    Yes.

18   Q    What was that demeanor?

19   A    She described him as calm, respectful, and she actually

20   described him as gentle.

21   Q    And when you talked with the -- when you or the agents

22   in Portland talked with the family up in Portland, were they

23   cooperative?

24   A    Yes.

25              MR. KENNEDY:  Nothing further.

```
 1                   MR. HUNT:  No further questions, Your Honor.
 2                   THE COURT:  Thank you.
 3                   I did just have one question.  Have you done any
 4    research into the identities of the individuals whose
 5    passports were found in the luggage?
 6                   THE WITNESS:  Yes.
 7                   THE COURT:  What have you been able to discover?
 8                   THE WITNESS:  I have identified that three of the
 9    individuals are shown to live in the United States or at
10    least be present in the United States at some point.  I've
11    seen that one of them has a full Social Security number, one
12    in Illinois, one in New York and one in Oregon -- in
13    Fairview, Oregon.  The others I have done preliminary checks
14    with Interpol, which have come back negative for anything.
15                   THE COURT:  Gentlemen, did that bring up anything
16    else for you?  Mr. Kennedy?
17                   MR. KENNEDY:  No, Your Honor.
18                   THE COURT:  Mr. Hunt?
19                   MR. HUNT:  Were any of these passports expired?
20                   THE WITNESS:  I don't know.  I didn't look at the
21    expiration.
22                   THE COURT:  Thank you, Agent Smilie.
23                   Mr. Kennedy, was that the only witness you were
24    contemplating?
25                   MR. KENNEDY:  Yes, Your Honor.
```

1              THE COURT:  All right.  Let's take some argument

2      from you, Mr. Kennedy, and then we'll go to Mr. Hunt.

3              MR. KENNEDY:  Your Honor, we believe that the

4      facts that are before the Court show both that the defendant

5      is a danger and is a risk of nonappearance.  On the danger

6      front, he appeared to have extremely violent tendencies, is

7      able to -- apparently able to turn that on and off at will,

8      and can become very violent, and we do think that that

9      presents a danger.  We also -- but, frankly, I think more

10     important is the risk of nonappearance.

11             He has significant ties outside of the United

12     States.  He has no ties to this jurisdiction.  He travels to

13     the Ukraine.  He apparently has no fear of returning to the

14     Ukraine, despite having claimed refugee status.  He was

15     planning on building a house in Ukraine, at least according

16     to his own statements.  He has financial resources to permit

17     travel.  He has -- he has certainly access to passports that

18     would facilitate that travel, either legitimate or false

19     passports.

20             He certainly has shown an interest in not being in

21     custody.  He attempted to bribe officers to let him go.  He

22     reacted extremely violently when evidence of these passports

23     was discovered and he was made aware that it was discovered.

24             He has -- he has admitted or stated that, in fact,

25     his refugee status was gained fraudulently.

1          So we do think all of these factors make him a

2    severe risk of nonappearance should he be released pending

3    the outcome of these charges.

4          THE COURT:  Thank you, Mr. Kennedy.

5          Mr. Hunt.

6          MR. HUNT:  Your Honor, I think that the evidence

7    shows that this is a specific incident that occurred.  I

8    dispute Mr. Kennedy's analysis of a turning on and off

9    switch of Mr. Baranovich.  I believe that the best evidence

10   of that is the fact that as soon as he is aware of somebody

11   and recognizes them, his attitude completely changes.  His

12   fright occurs when he was -- first off, the incident itself,

13   but, secondly, when people he doesn't know are doing

14   something to him, we're not sure if he's coherent at that

15   point.  And there's two incidents that occurred then, one

16   shortly after he arrives at the jail and then shortly before

17   he's put in cells both times.  Every time he's confronted

18   with someone that he recognizes, including Special Agent

19   Smilie, he's fine, someone that he recognizes and he's

20   comfortable with.

21          From the date that he has been appointed counsel

22   and with the assistance of interpretation, he has been

23   mellow, calm.  You've been able to identify his demeanor in

24   court today.  This demeanor is consistent with what I've

25   been meeting with him from earlier today.  It's consistent

1   with what occurred in the last court hearing.  And he

2   recognizes and he is fine.  His incidents occur when he did

3   not.  This might lead into what happened in the incident

4   itself, but I do think that this is a specific incident

5   thing tied to some significant paranoia.

6              I don't believe that he is a risk of danger to

7   other individuals or we would have seen -- he's been here

8   for seven years, we would have seen something in the form of

9   some other type of ag assault, or assault or aggression,

10  he's turned this switch on and off before.  It doesn't

11  exist.

12             And these are -- and you can specifically identify

13  the times when, bam, it happens this time when he's thrown

14  into a jail and he's confused and there's not anyone there

15  telling him what's going on and things don't happen.

16             Also the next one is -- I just -- I really don't

17  need to -- I don't believe we need to spend more time on the

18  danger, unless the Court has questions on that, because I

19  don't believe that you're looking at an individual here who

20  is violent as long as he's aware of what's going on.

21             Also another circumstance, I would bring up one

22  other thing there, is family.  His sons are on their way

23  here.  They should be here within the half hour.  If there

24  is any issue regarding someone to watch or guide or help him

25  with recognition and with whom he trusts, they are on their

1    way here.  This is according to discussions with us as well

2    as probation today.

3              I do not believe that his access to passports

4    increases risk of flight.  The high majority of these are

5    women.  The passports have all been seized.  He does not

6    have any record of coming and going and coming and going and

7    coming and going that has been represented today.  There is

8    no other record of any other type of conduct that would

9    suggest passport usage.  And regardless of all of that, they

10   are taken from him.  They are gone.

11             And the money amount was about 6,000 bucks.  We're

12   not talking a lot of money.  Traveling from the Ukraine

13   doesn't seem unreasonable to have that amount of money.

14             Bribery, I just threw that out flippantly, but

15   it's probably not a flippant argument.  I wouldn't be

16   surprised if that's how they deal with things in the Ukraine

17   on a daily basis and the way they handle things.  I do

18   believe that that's of some significance to the Court, and I

19   don't deny that he attempted to do that.  I do believe there

20   are conditions and recommendations that can be made that

21   could resolve that and to make sure that he is comfortable.

22             Your Honor, I believe his mental health condition,

23   I believe there are concerns over what happened, that there

24   was a mental departure that happened on the airplane.  I

25   think that it would assist not only the government, not only

1    defense, but it would assist the Court to allow

2    Mr. Baranovich to be with his family and to allow them to

3    care for him.  They have no problem with him when he's been

4    home.  Nothing like this has occurred.  They have money.

5    They are capable of transporting him here.  They are capable

6    of watching over him.  He has, as has been testified to, he

7    has a house where he resides, a family that supports him,

8    and they are actually on their way here to be able to

9    assist, and they can get him here.

10          We believe that these circumstances show that it's

11   not only in the best interest of everybody, but

12   Mr. Baranovich's mental health interest that he be allowed

13   to stay out and this matter -- so this matter can be

14   resolved without further exacerbating what is right now an

15   obviously tragic incident that has occurred.

16          THE COURT:  Thank you, Mr. Hunt.

17          Mr. Kennedy.

18          MR. KENNEDY:  Just a couple of quick points, Your

19   Honor, for clarification.

20          First, I think it bears noting that Mr. Baranovich

21   certainly did know Special Agent Smilie and had actually

22   been talking with him for over an hour at the point where

23   those passports were found and he was made aware of that,

24   and that's when he became quite agitated.  So it wasn't a

25   matter of comfort, not comfort.  Frankly, what it was, it

1    was something was found that he really did not want to be

2    found and that he thought was a very, very big problem for

3    him.

4           And that's the point -- that's really the point of

5    the passports is that there is something with regard to

6    those passports that the defendant thinks is much more

7    serious than the charges that he's actually facing at this

8    point, and that he was willing to take that risk and

9    basically freaked out when that was found.  And that is what

10   we think -- in addition to the charges he's facing here, he

11   does not want to face any consequences with regard to that.

12          And he is clearly comfortable in the Ukraine.  He

13   just came back from spending 50 days there.  So he would

14   have no problem returning to that life where he has family.

15          THE COURT:  Thank you.

16          Gentlemen, if you would give me just a few

17   minutes, I'm going to review a couple of things.

18          MR. HUNT:  May I make one comment, Your Honor?

19          THE COURT:  Yes, of course, Mr. Hunt.

20          MR. HUNT:  As far as your analysis goes, Your

21   Honor, I don't believe that Mr. Baranovich's reaction to

22   opening a bag and speculation that occurred when he looked

23   at the passports is relevant to the two factors that the

24   Court is asked to look at today.  It's part of an incident

25   that occurred.  It may or may not be true, I'm not disputing

 1  that, but the fact is I don't know how that would affect his

 2  threat of danger or his risk of flight.  That's it.

 3            THE COURT:  Thank you, gentlemen.  Very capably

 4  argued.  Can you give me ten minutes?  I will be back to

 5  issue my decision.

 6            (Recess)

 7            MR. HUNT:  (Inaudible)  I wanted them to represent

 8  that they haven't in their lives seen an incident like this

 9  in their father.

10            THE COURT:  Mr. Kennedy, will you be willing to

11  accept that proffer?

12            MR. KENNEDY:  That's fine, Your Honor.

13            THE COURT:  Thank you, gentlemen.  I appreciate

14  your patience as I've tried to struggle with the decision,

15  and I do say struggle because I see clear merit to both

16  arguments.

17            The standard is a difficult one and there are

18  competing facts that I think both work for and against the

19  government's position and for and against the defendant's

20  claims.  So I've gone back to take a look at the statute and

21  I think that's where I would like to start.

22            Of course, we start with the nature and the

23  circumstances of the offense charged.  The complaint, which

24  is all we have right now, speaks for itself.  It hasn't yet

25  been presented to the grand jury.  My understanding is that

1    will take place in a couple of weeks.

2              Is that right, Mr. Kennedy?

3              MR. KENNEDY:  Yes, Your Honor.

4              THE COURT:  So I give that what weight I can.

5              I don't know if there was much contested claims

6    regarding what is alleged in the complaint, but the

7    complaint does allege a very serious set of circumstances.

8              Mr. Hunt, you've kind of suggested that there may

9    be something else going on here.  As I look through the

10   complaint and as I try to balance that versus what you've

11   talked about, that this appears to be an anomaly, there

12   definitely is some concern that's raised in my mind as to

13   whether there is an issue that maybe needs to be addressed,

14   substance or mental health based.  I'm going to get to that

15   in a second.  But the nature and circumstances of the

16   offense charged are quite serious.

17             The weight of the evidence against a person I

18   think is fairly significant.  Neither party really addressed

19   that in great deal, so I'm taking the complaint kind of for

20   what it is.  Those I think do cut against the defendant in a

21   significant way.  It's not an insurmountable way, but then I

22   turn to the history and characteristics of the defendant.

23             Let's start with his character first.  Mr. Hunt,

24   you've suggested that this does not appear to be in

25   character, at least as it relates to the violent episode.  I

1    would agree with you.  The character, as it's been

2    represented to me, this seems out of character.  It's hard

3    for me, based on an absence of criminal record, to find

4    something that this is a pattern rather than an anomaly, at

5    least as it relates to dangerousness.

6            We have the sons here who would proffer, the

7    proffer was accepted, that he's not a violent person by

8    definition.  I was persuaded in significant part by your

9    argument that, look, if this is who he is, we would see

10   something, we would see a criminal record.

11           I admit I don't have much detail regarding the

12   dates of the alleged criminal offenses in Ukraine, but even

13   then only one of them relates to a violent propensity.  I'm

14   assuming, although it may be without some support, that that

15   took place, of course, not during the last trip.  I believe

16   that would have been stated if that took place.  I believe

17   that took place before he came to the United States as a

18   refugee, unless I'm mistaken.

19           MR. KENNEDY:  That's my understanding, Your Honor.

20           THE COURT:  So we've got an incident in the

21   Ukraine from 14 or 15 years ago, and then this incident, and

22   nothing intervening.  So, Mr. Hunt, I think on the issue of

23   dangerousness, I'm inclined to agree, but it's not without

24   some reservations because the incident here is exceptionally

25   dangerous.  It's not with the intent to harm anybody

1   necessarily.  The complaint doesn't suggest that.  The

2   complaint just suggests that maybe something else is going

3   on, but I don't think it related to any sinister intent to

4   harm.  So I'm persuaded by your point of view that there is

5   not a dangerous consideration.  The circumstances are

6   dangerous, but I don't think his history and characteristics

7   are dangerous.

8            Let me go to the second issue of physical and

9   mental condition.  I do have some significant concerns here.

10  It is my opinion that a mental health assessment should be

11  ordered.  I'm going to get to that in just a second, but

12  it's hard for me to account for what's gone on here.  If it

13  is an anomaly for him to act in the way that he has, I'm

14  lacking the origins for that conduct.  I'm having a hard

15  time understanding what would prompt this type of behavior,

16  particularly as was brought out during testimony that even

17  he himself has suggested that he didn't overly consume

18  alcohol from Boston to Salt Lake.  I don't know about the

19  legs from Amsterdam to Boston.  But it doesn't appear that

20  there was a whole lot going on.  Perhaps two beers in Boston

21  and then some water and a glass of wine on the way from

22  Boston to Salt Lake, if I understood the testimony right.

23  That doesn't strike me as something that is a

24  disproportionate use of alcohol that would suddenly trigger

25  this type of incident.

1           I think something else is going on and I do have

2    some concerns because if the catalyst -- if this was a

3    catalyst for some what appears to me to be bizarre and maybe

4    out of character conduct when he gets in fighting stances,

5    when he's not cooperative, when he's not compliant.

6           Mr. Hunt, you mentioned something that I think is

7    entitled to some weight, that is the circumstance by itself

8    is frightening.  He is in a city he doesn't know.  He's in a

9    problem that he's not previously had.  On the other hand,

10   Mr. Kennedy mentioned that his reactions aren't just

11   circumstance based on unfamiliarity.  They are also based on

12   what the agent was discovering.  So I think there's some

13   truth to both there.

14          Family ties, there clearly are some family ties.

15   I think that cuts in the respondent's favor.

16          Employment is not exactly verified.  I take it for

17   what it's worth in the pretrial services report.  There do

18   appear to be some financial resources.  He has some

19   residence in the community, albeit not in Utah.  Ordinarily,

20   Mr. Hunt, I don't think residence outside the District of

21   Utah is overly concerning.  But the residence prong does

22   concern me here for other reasons, and that is what appears

23   to be -- at least it wasn't contested -- that his original

24   obtaining a permanent residence status in the United States

25   was based on a false premise.  That is the false claim of

1   Pentecostal Baptist which gave rise to the refugee status

2   which got him to the United States.

3           If I understand what happened correctly, he then

4   became a permanent resident based on that same false

5   premise.  Whether the government would now move to rescind

6   permanent resident status based on the false representation

7   that he may have made, that's an issue that nobody really

8   brought up, but I think that concerns me from my point of

9   view that his residence may be subject to some shaky

10  foundation, in my opinion right now.

11          Past conduct I think cuts in his favor, Mr. Hunt,

12  as you have suggested.  History relating to drug or alcohol

13  abuse, it doesn't appear that there is much.  I am aware of

14  the claims he made about being perpetually drunk over the

15  past several days in Ukraine, but it doesn't seem that

16  that's his history in the United States.  If there was, I

17  suspect that we would see it manifested in a criminal record

18  of some kind, and we just don't have that.  I think it would

19  also show up because if I understand his employment right,

20  it relates to driving trucks and things.  I think it would

21  have manifested itself in some way.

22          Consequently, we don't have a record concerning

23  appearance at court proceedings.  That being said, I'm at a

24  little bit of a disadvantage regarding the criminal history

25  in the Ukraine, which he brought forth on his own.  Again, I

1    assume that's from some time ago.

2          Let's go, then, to some of the circumstances here

3    in the case.  We have discussed briefly the money.  I am

4    with you a little bit here, Mr. Hunt.  I'm not sure what

5    weight to account for the money and the passports.  All I

6    know is that they have given me pause.  And maybe -- maybe

7    that's for some non-sinister reason, I don't know.  I don't

8    know what the explanation would be for having the numerous

9    passports, the majority of which belong to women, in his

10   possession and why he would get angry at the discovery of

11   them.

12         Admittedly, the government has to carry the burden

13   of proof here.  They have presented a circumstance that's

14   troubling to me.  I just don't have any information from the

15   defendant that would explain why he possessed those.  You've

16   mentioned that they may not necessarily go to risk of flight

17   or danger.  I am not so sure.  In my mind, it suggests that

18   he has access to travel documents that the ordinary person

19   may not.  And absent greater clarification from the

20   defendant, who has no burden here, but he hasn't provided an

21   explanation which leads me to believe that I should give

22   that far lesser weight than I otherwise would.

23         There is the additional issue of paying or

24   offering to pay the bribe, which I think you've conceded,

25   Mr. Hunt, should give someone pause.  It certainly does me.

1    There may be some customary use of bribery in Ukraine.  I'm

2    not suggesting that's not plausible, but at the same time I

3    think it does go to risk of flight here.  If the defendant

4    in a different circumstance is willing to offer money for

5    his release, that does, in my opinion, impact risk of

6    flight, especially in light of his residence in the United

7    States of nearly 15, or 16 years.

8            I admit, on the other hand, that he doesn't appear

9    to have been arrested before.  But residence in a country

10   for 16 years and then offering a bribe twice to people for

11   release concerns me significantly as it relates to risk of

12   flight.

13           Gentlemen, based on the evidence that's been

14   provided in its totality, I do not believe that there are

15   conditions that will reasonably assure his appearance.  In

16   large part, it stems from the circumstances I've described,

17   but it also stems from the things we don't know.  I don't

18   know if there is a mental health issue.  I don't know if

19   that would implicate or help me understand or would explain

20   why he acted the way he did and whether he would be likely

21   to appear at court.  My order today is I'm going to detain

22   him as a risk of flight and at the same time I'm going to

23   order a mental health assessment.  I think it can shed some

24   light.

25           I'm willing to revisit the detention issue after

1  seeing that mental health assessment.  It may give me

2  something that I don't otherwise have.  But at this point I

3  am not comfortable, I believe the government has met its

4  burden, and the defendant will be ordered detained pending

5  trial.

6              Mr. Kennedy, anything else from the government?

7              MR. KENNEDY:  No, Your Honor.  Thank you.

8              THE COURT:  Mr. Hunt?

9              MR. HUNT:  Do we -- so if we bring other -- you

10 would like -- before we are allowed to come back before the

11 Court, you would like an assessment?

12             THE COURT:  I'm going to permit this as a

13 continuing application for lack of a better term.  I know it

14 may not be a new change in circumstance.  I really think it

15 would shed greater light.  I am not willing to commit to

16 changing my decision, but I do think there's enough concern

17 here that I would be willing to revisit this without having

18 to find a changed circumstance if the mental health

19 assessment warrants it.

20             I probably didn't say that very artfully, but is

21 that clear?

22             MR. HUNT:  No, I'm clear.

23             THE COURT:  Thank you, Mr. Hunt.

24             The hearing is concluded.

25             (Whereupon, the proceeding was concluded.)

1                    C E R T I F I C A T E

2

3

4            I hereby certify that the foregoing matter is

5    transcribed from the stenographic notes taken by me and is a

6    true and accurate transcription of the same.

7

8

9

10

11

12

13

14

15

16   PATTI WALKER, CSR-RPR-CP       DATED: 11-20-2012
     Official Court Reporter
17   350 South Main Street, #146
     Salt Lake City, Utah  84101
18   801-364-5440

19

20

21

22

23

24

25